INTERTRIBAL SINKYONE
WILDERNESS COUNCIL,
et al., Plaintiffs,

v.

NATIONAL MARINE FISHERIES
SERVICE, et al., Defendants.

No. 1:12–cv–00420 NJV

United States District Court,
N.D. California.
Eureka Division

Filed 09/25/2013

Kristen Lee Boyles, Stephen Mashuda, Earthjustice Legal Defense Fund, Seattle, WA, for Plaintiffs.

Kevin William McArdle, United States Department of Justice, Washington, DC, for Defendants.

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

(Doc. nos. 31, 49.)

NANDOR J. VADAS, United States Magistrate Judge

This is an action pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, alleging violations of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* and the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.* The case concerns the National Marine Fisheries Service's development of five-year regulations authorizing activities by the United States Navy in its Northwest Training Range Complex, a three-year letter of authorization issued pursuant to those regulations, and two biological opinions evaluating the Navy's activities. The case involves the Navy's use of sonar while conducting anti-

submarine warfare training, and proceeds on cross motions for summary judgment.[1] As set forth below, the court grants in part and denies in part Plaintiffs' motion for summary judgment, and grants in part and denies in part Defendants' motion for summary judgment.

## THE ENDANGERED SPECIES ACT

The Endangered Species Act ("ESA") provides for the listing of species as threatened or endangered and for the designation of their critical habitat. 16 U.S.C. § 1533. The Secretary of the Interior is responsible for listed terrestrial and inland fish species and administers the ESA through the U.S. Fish and Wildlife Service ("FWS"). The Secretary of Commerce is responsible for listed marine species and administers the ESA through the National Marine Fisheries Service ("NMFS"). 16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

ESA Section 7(a)(2) directs each agency to insure, in consultation with the FWS or the NMFS ("the consulting agency"), that "any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of" any listed species or to destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2). Consultation is required if the agency proposing action ("the action agency") determines that the proposed action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a). If such a determination is made, the action agency may pursue either formal or informal consultation. *See id.* §§ 402.13–402.14. Formal consultation is required unless the ac-

tion and consulting agencies concur, in writing and after informal consultation, that the proposed action is "not likely to adversely affect" listed species or critical habitat, in which case the consultation process is terminated and no further action is necessary. *Id.* §§ 402.14(b)(1), 403.13(a).

Where adverse effects are likely, the requirement for formal consultation is triggered. *See id.* At the conclusion of formal consultation, the consulting agency issues its "biological opinion" as to whether the proposed action is likely to jeopardize the continued existence of any listed species or destroy or adversely modify critical habitat. *Id.* § 402.14(h). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The biological opinion must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 1536(a)(2), 402.14(g)(8).

"If jeopardy or adverse modification is found, the [consulting agency] shall suggest those reasonable and prudent alternatives which [it] believes would not violate [ESA Section 7(a)(2)] and can be taken by the [action] agency or applicant in implementing the agency action." 16 U.S.C. § 1536(a)(3)(A). However, where no jeopardy or adverse modification is found, the ESA imposes no similar requirement on the consulting agency; rather, the proposed action may proceed as planned, sub-

---

1. The court granted a motion by Canadian environmental groups to file an amicus brief. (Doc. nos. 42–45, 47, 48, 60.) While the court appreciates the information provided by our concerned neighbors to the north, the amicus brief does not directly address the issues raised by the parties in this case. The court, therefore, will not address the arguments raised by the amici.

ject to potential restrictions on incidental take described below. *See id.*

Section 9 of the ESA generally prohibits the "take" of members of a listed species without prior authorization from the consulting agency, which in this case is the NMFS. 16 U.S.C. §§ 1538(A)(B), 1539(a)(1)(B). Under the ESA, the term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* at § 1532(19). In 1982, the ESA was amended "to resolve the situation in which a federal agency ... has been advised that the proposed action will not violate Section 7(a)(2) of the ESA, but the proposed action will result in the taking of some species incidental to that action." H.R.Rep. 97–567,97th Cong., 2nd Sess., at 26–27, *reprinted in* 1982 U.S.C. C.A.N. 2807, 2826–27 (May 18, 1982). In these circumstances, the NMFS must issue an incidental take statement ("ITS") specifying the amount or extent of anticipated take, any reasonable and prudent measures the NMFS "considers necessary or appropriate" to minimize the impact of the take, and mandatory terms and conditions to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). "Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2). The ITS provides an exception to the take prohibition in ESA Section 9; any take in compliance with the terms and conditions of the ITS is not unlawful. 50 C.F.R. § 402.14(i)(5).

In 1986, the ESA was again amended "to clarify the relationship between" the MMPA and the ESA. 132 Cong. Rec. S31281, 31295, 1986 WL 789325 (Oct. 16, 1986). As amended, the ESA provides that when the proposed action will result in the take of ESA-listed marine mammals, the NMFS may not issue an ITS unless the take has been authorized under MMPA. 16 U.S.C. § 1536(b)(4)(C). The ITS must also incorporate the mitigation measures for ESA-listed marine mammals prescribed by the MMPA take authorization. *Id.* at § 1536(b)(4)(C)(iii). Thus, Congress "intended that the decision processes under the [MMPA and ESA] be coordinated and integrated to the maximum extent possible." 132 Cong. Rec. at S31295, 1986 WL 789325; 132 Cong.Rec. S32181, 32185, 1986 WL 788463 (Oct. 16, 1986); 54 Fed.Reg. 40338, 40346 (Sept. 19, 1989) (preamble to regulations implementing 1986 amendments).

## THE MARINE MAMMAL PROTECTION ACT

The Marine Mammal Protection Act ("MMPA") generally prohibits the "take" of marine mammals. 16 U.S.C. § 1371(a). Under the MMPA, "take" means "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal." 16 U.S.C. § 1362(13). For purposes of military readiness activities, the term "harassment" means:

(i) any act that injures or has the significant potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or

(ii) any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavior patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered. [Level B harassment].

16 U.S.C. § 1362(18)(B). The Secretary of Commerce, acting through the NMFS, administers the MMPA with respect to the

cetaceans (whales, dolphins and porpoises) and pinnipeds (seals and sea lions) at issue in this case. *Id.* at § 1362(12)(A)(i).

The MMPA allows several exceptions to the general take prohibition. *See id.* at § 1371(a)(1)-(5). Section 101(a)(5)(A) provides an exception for incidental taking of "small numbers" of marine mammals from "a specified activity (other than commercial fishing) within a specified geographical area." 16 U.S.C. § 1371(a)(5)(A)(i). Upon request, the NMFS "shall allow" such take "during periods of not more than five consecutive years" if the NMFS determines, after notice and the opportunity for public comment, that the total take would have a "negligible impact" on the relevant species or stock and would not have an "unmitigatible adverse impact" on availability for specified subsistence uses. *Id.* at § 1371(a)(5)(A)(i)(I).

In 2003, Congress amended the MMPA to exempt military readiness activities from the "small numbers" and "specified geographical region" requirements. *Id.* at § 1371(a)(5)(F)(i). Accordingly, the NMFS may authorize take of marine mammals incidental to military readiness activities for periods of not more than five years if it makes the requisite "negligible impact" and "unmitigated adverse impact" findings. *Id.* at § 1371(a)(5)(A)(i)(I). "Negligible impact" means "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effect on annual rates of recruitment or survival." 50 C.F.R. § 216.103.

If the NMFS makes the required findings, it must promulgate regulations specifying permissible methods of take and other means of effecting the "least practicable adverse impact" on the affected species or stock and its habitat. 16 U.S.C. § 1371(a)(5)(A)(i)(II). For military readiness activities, the "least practicable adverse impact" determination "shall include consideration of personnel safety, practicality of implementation, and impact on the effectiveness of the military readiness activity." *Id.* at § 1371(a)(5)(A)(ii).

The NMFS's general regulations implementing the MMPA establish a multi-step process for issuing take authorizations under Section 101(a)(5)(A), which consists of (1) promulgating specific regulations governing the take incidental to the specified activities and (2) the issuance of letters of authorization under those regulations. The NMFS must "begin the public review process by publishing in the Federal Register ... [a] notice of receipt of a request for the implementation or reimplementation of regulations governing the incidental taking." 50 C.F.R. § 216.104(b)(1)(ii). "NMFS will invite information, suggestions, and comments for a period not to exceed 30 days from the date of publication in the Federal Register. All information and suggestions will be considered by the [NMFS] in developing, if appropriate, the most effective regulations governing the issuance of letters of authorization." *Id.*

These regulations further require that "[a]ny preliminary findings of 'negligible impact' and 'no unmitigable adverse impact' ... be proposed for public comment along with either the proposed incidental harassment authorization or the proposed regulations for the specific activity." *Id.* at § 216.104(c). If the NMFS finds after public review that the requested taking by the specified activity meets the statutory criteria, the NMFS must promulgate the specific regulations for the allowed activities setting forth "permissible *methods of taking*" and "[m]eans of effecting the least practicable adverse impact on the species and its habitat and on the availability of the species for subsistence uses." *Id.* at

§ 216.105(b). "Regulations will be established based on the best available information. As new information is developed, through monitoring, reporting, or research, the regulations may be modified, in whole or in part, after notice and opportunity for public review." *Id.* at § 216.105(c).

Finally, a "Letter of Authorization ... is required to conduct activities pursuant to any regulations established under § 216.105." *Id.* at § 216.106(a). "Issuance of a Letter of Authorization will be based on a determination that the level of taking will be consistent with the findings made for the total taking allowable under the specific regulations." *Id.* at § 216.106(b). "Letters of Authorization will specify the period of validity and any additional terms and conditions appropriate for the specific request." *Id.* at § 216.106(c).

## BACKGROUND

The Northwest Training Range Complex ("NWTRC") includes ranges and airspace that extend west 250 nautical miles (463 kilometers) beyond the coast of Northern California, Oregon and Washington, and east to Idaho.[2] AR Doc. B.65 at 4622. The offshore area of the NWTRC extends from the inland marine waters of Puget Sound in Washington, west to the outer coast of Washington, and south to the Lost Coast region of Northern California in Northern Mendocino County. It extends from the Strait of San Juan de Fuca in the north, to approximately 50 nautical miles (93 kilometers) south of Eureka, California. *Id.*

In 2008, the Navy applied to the NMFS for authorization under the MMPA and the

ESA to incidentally "take" marine mammals during anti-submarine warfare ("ASW") training exercises to be conducted in the NWTRC over a five-year period. The Navy uses various types of active and passive sonar during ASW training exercises. Active sonar is used to locate quiet objects (such as quiet diesel-electric submarines) and to establish both bearing and range to the detected contact. By knowing the speed of sound in water and the time taken for the sound wave to travel to the object and back, active sonar systems can quickly calculate direction and distance from the sonar platform to the underwater object. AR Doc. B.97 at 7711, AR Doc. B.25 at 1323–24. This case involves the Navy's use of mid-frequency active sonar. Mid-frequency active sonar has a detection range of up to 10 nautical miles, making it the Navy's primary tool for conducting ASW and ensuring the survivability of U.S. ships. AR Doc. B.97 at 711–12. Mid-frequency active sonar "is a complex technology, and sonar operators must undergo extensive training to become proficient in its use." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 13, 129 S.Ct. 365, 370, 172 L.Ed.2d 249 (2008). "Sonar reception can be affected by countless different factors, including the time of day, water density, salinity, currents, weather conditions, and the contours of the sea floor." *Id.* "The Navy conducts regular training exercises under realistic conditions to ensure that sonar operators are thoroughly skilled in its use in a variety of situations." *Id.*; AR Doc. B.97 at 7712.

The NWTRC includes an inshore and offshore area, with the offshore area extending west beyond the coast of Washington, Oregon, and Northern California. AR

2. A kilometer is roughly .54 nautical miles. Defendants' Reply, n. 22. *See Native Village of Point Hope v. Salazar,* 680 F.3d 1123, 1133 (9th Cir.2012) (Technical issues falling

squarely within agency's area of expertise "are accorded great deference by a reviewing court.").

Doc. B.25 at 1213–14, 1299. Most of the Navy's ASW training in the NWTRC occurs in an area known as "W–237" off the coast of northern Washington. AR Doc. B.6 at 41; AR Doc. B.25 at 1214, 1216. The Navy did not seek incidental .take authorization for active sonar training in the inshore portion of the NWTRC, due to the fact that such training has been discontinued at that location. Thus the specified activities covered by the MMPA regulations at issue in this case do not include active sonar training in the inshore portion of the NWTRC. AR Doc. B.6 at 37; AR Doc. B.65 at 4655–56, 4633.

Destroyers and frigates that conduct ASW training in the NWTRC are equipped with hull-mounted mid-frequency active sonar systems. AR Doc. B.97 at 7714. Defendants assert that these systems are associated with the vast majority of takes authorized under the challenged MMPA regulations. Defendants' Motion and Opposition, 10:4–5; see AR Doc. B.6 at 40. The Navy has conducted ASW training in the NWTRC for decades using these or similar hull-mounted mid-frequency active sonar systems. AR Doc. B.97 at 7890; AR Doc. B.25 at 1223; AR Doc. B.65 at 4622.

Within the NWTRC, frigates and destroyers do not conduct coordinated major training exercises in which multiple vessels may be simultaneously engaged in mid-frequency active sonar use. Instead, a single frigate or destroyer may use mid-frequency active sonar occasionally for short periods of time (1 to 1.5 hours) while transiting through the range. See AR Doc. B.6 at 40. These exercises generally take place more than 50 nautical miles from shore in the offshore portion of the NWTRC. Id. The estimated 1.5 hours of sonar use per transit does not involve continuous sonar transmission. Rather, the sonar systems transmit intermittent pulses of sound ("pings") that travel through the water, reflect off objects and return to a receiver. AR Doc. B.97 at 7714. In general, the sonar systems used by the Navy may emit 120 active pings per hour (one every thirty seconds), with each ping lasting approximately one second. Id.; see AR B.6 at 32.

The Navy also uses SQS–62 "sonobuoys" (small, expendable sonar systems) in the NWTRC that are equipped with mid-frequency active sonar. AR Doc. B.65 at 4625. These sonobuoys are deployed by aircraft to assist in locating and tracking submarines or ASW targets during an exercise. AR Doc. B.97 at 7715. The sonobuoys' mid-frequency active sonar systems operate at significantly lower source levels than the hull-mounted. systems and for far shorter periods of time (12 pings per use, 30 seconds between pings for modeling purposes). AR Doc. B.6 at 32.

In November 2010, the NMFS granted the Navy's application and issued regulations under the MMPA governing the take of marine mammals incidental to Navy training in the NWTRC for a period of five years from November 2010 through November 2015 ("the Final MMPA Rule"). AR Doc. B.6. The NMFS also engaged in formal consultation pursuant to the ESA Section 7(a)(2). On June 15, 2010, the NMFS issued the Final Biological Opinion ("the Five Year BiOp") concluding that the authorized take and associated training activities are not likely to jeopardize the continued existence of any species listed as threatened or endangered under the ESA. AR Doc. A.1. In October 2012, the NMFS issued the final Letter of Authorization ("LOA") under the MMPA regulations, along with a new Biological Opinion under the ESA ("LOA BiOp") reaffirming its no jeopardy conclusion. AR Doc. F.2.

Plaintiffs filed this action on January 26, 2012. (Doc. no. 1.) Plaintiffs filed their

motion for summary judgment on December 18, 2012. (Doc. no. 31.) Defendants filed their cross motion for summary judgment on February 8, 2013. (Doc. no. 49.)

## LEGAL STANDARD

■ Absent a separately-created right of action, the review of a final agency action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). No separate right of action exists under the statutes at issue here, therefore the court will review the case under the APA. Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* at § 706(2)(A) and (C). The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotations omitted). "A reasonable basis exists where the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Peck v. Thomas,* 697 F.3d 767, 772 (9th Cir. 2012) (citation omitted).

■ There are no disputed facts to be resolved. Instead, the function of the court is to determine whether the agency properly made the decision it did, based on the evidence in the administrative record. *See Occidental Eng'g Co. v. I.N.S,* 753 F.2d 766, 769–70 (9th Cir.1985). Summary judgment is the appropriate mechanism for deciding, under the deferential APA standards and on the basis of the administrative record, "the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770. Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Southern California Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir.2003).

## DISCUSSION

*Use of Best Available Scientific Data*

■ Congress enacted the Endangered Species Act "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA requires in Section 7(a)(2) that all federal agencies, in consultation with the NMFS and/or the U.S. Fish and Wildlife Service, "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" their critical habitat. 16 U.S.C. § 1536(a)(2). The obligation to "insure" that an action is not likely to jeopardize a species or destroy or adversely modify its critical habitat requires the agencies to "give the benefit of the doubt" to endangered or threatened species and to place the burden of risk and uncertainty on the proposed action. *Sierra Club v. Marsh,* 816 F.2d 1376, 1386 (9th Cir.1987) (holding that risk of uncertainty "must be borne by the project, not by the endangered species"). In fulfilling their obligation, agencies must base their decisions on the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

In the Five Year BiOp issued in 2010, the NMFS based its estimates of the numbers of marine mammals exposed to harmful levels of sonar and its analysis of the effects of these exposures on individuals and populations in part on the assumption that cetaceans did not experience temporary hearing loss ("TTS") at sound levels below 195 decibels and did not suffer permanent hearing loss ("PTS") at levels below 215 decibels. AR Doc. A.1 at 78, 87, 198, 208–09, 236, 296–97. It carried these same levels—and the analysis and conclusions based on them—forward in the LOA BiOP issued in 2012. Plaintiffs contend that in doing so, the NMFS failed to use the best science available in the LOA BiOp.

Specifically, Plaintiffs contend that scientific evidence and analysis developed after the Five Year BiOp but before the LOA BiOp demonstrate that the previous levels for hearing loss (both temporary and permanent) were inaccurate and likely underestimate both the number of instances when mid-frequency sonar will affect marine mammals and the severity of those exposures. Plaintiffs claim that peer-reviewed studies published in the last four years (and funded in part by the Navy and the NMFS) demonstrate that marine mammals are harmed by sonar at lower sound levels than previously thought. They further claim that as a result of incorporating this science into their modeling of take resulting from Navy sonar activities in Hawaii and Southern California and for the Navy's Atlantic Fleet training, the Navy and the NMFS have predicted a significant increase in take of marine mammals and an increase in the harm occurring from the take. Plaintiffs cite as support the May 2012 Draft Environmental Impact Statement for Hawaii and Southern California Training and Testing Activities ("DEIS"). *See* Declaration of Stephen D. Mashuda, Exhibits 1 and 2. In that document, the agencies apply a threshold of 178 decibels for onset of temporary hearing loss and a threshold for onset of permanent hearing loss of 198 decibels. *Id.* Plaintiffs claim that despite this new information and its application in other decisionmaking by the agency, the NMFS in the LOA BiOp continued to rely on the data it utilized in the Five Year BiOp without acknowledging the newer data.

Defendants describe Plaintiffs' contention as "NMFS should have short-circuited the ongoing NEPA and MMPA processes for the Atlantic Fleet and Hawaii/Southern California ranges and employed the proposed thresholds in the October 2012 LOA and BiOp for the NWTRC." Defendants' Motion and Opposition, 24:13–15. Defendants claim this contention lacks merit, arguing that the proposed thresholds described in the Navy's draft EIS are not "scientific data" within the meaning of the ESA. Rather, they claim, the proposed thresholds are the product of the Navy's evaluation, interpretation, and synthesis of "data from a range of studies and sources." Defendants' Motion and Opposition, 21:16. Further, Defendants assert that the proposed new thresholds were not available for use in October 2012 because the Navy's and the NMFS's evaluation of the thresholds and the public review process required by NEPA and the MMPA are ongoing and incomplete. *Id.* at 17–19.

■ Plaintiffs cite three peer-reviewed studies to support their argument. They assert Finneran and Schlundt (2010) demonstrated that higher frequency sounds induced hearing loss at lower exposure levels and that the previous single numeric threshold for hearing loss (independent of frequency of the sound) was no longer correct. *See* Second Declaration of Stephen D. Mashuda, Exhibit 3 (James J.

Finneran, *Frequency-dependent and Longitudinal Changes in Noise-induced Hearing Loss in a Bottlenose Dolphin*, 128 J. Acoust. Soc. Am. (2) 567–570 at 657, 568 (2010)). They assert Finneran and Schlundt (2011) developed new methods to estimate how dolphins and whales perceive the loudness of received sounds of varying frequencies. *See* Second Declaration of Stephen D. Mashuda, Exhibit 4 (James J. Finneran, *Subjective Loudness Measurements and Equal Loudness Contours in a Bottlenose Dolphin*, 130 J. Acoust. Soc. Am. (5) at 3124–3136 (2011)). Citing the DEIS from the Hawaii–Southern California Training and Testing Activities, Plaintiffs claim that together, the two Finneran and Schlundt studies "predict appreciably higher (almost 20 dB) susceptibility" to mid-frequency sonar for whales with hearing sensitivity to the mid-frequency range and support the development of new thresholds for whales with hearing sensitive to the mid-frequency range and support the development of new thresholds that account for this greater susceptibility." Mashuda Declaration, Exh. 1 at 3.4–118.

Plaintiffs also cite a 2011 study which concluded that beaked whales were more sensitive to mid-frequency sonar than previously thought. AR Doc. G.13 (Peter L. Tyack, *et al.*, *Beaked Whales Respond to Simulated and Actual Navy Sonar*, www.plosone.org, vol. 6, issue 3 (March 2011)). The authors conclude that the "results do support a lower acoustic threshold of disturbance for beaked whales than is currently applied in the US." AR Doc. G.13 at 7. Based on this evidence, the NMFS and the Navy have elsewhere lowered the thresholds for behavioral as-

sessment of beaked whales. *See* Mashuda Decl., Exh. 1 at 3.4–126 (Hawaii–Southern California Training and Testing Activities Draft Environmental Impact Statement summarizing that "there are now statistically strong data demonstrating that beaked whales tend to avoid ... actual naval mid-frequency sonar in real anti-submarine training scenarios ... [t]he Navy has therefore adopted a 140 dB re 1 Pa sound pressure level threshold for behavioral effects for all beaked whales"). Beaked whales are not among the ESA-listed species considered in the LOA BiOp, but Plaintiffs argue that the study should have been considered in the ESA context for any relevance it may have to assessing impacts on ESA-listed species. They note that the NMFS and the Navy elsewhere extrapolate data from one species to another, such as with bluenose dolphin data. Plaintiffs argue that while the NMFS included the beaked whale study in its list of references in the LOA BiOp, it did not discuss its relevance to its ESA analysis.[3]

Defendants argue that while the Finneran and Schlundt 2010 and 2011 dolphin studies raised concerns about existing TTS thresholds and "suggest that modification of the mid-frequency cetacean auditory weighting function is necessary," Mashuda Decl., Ex. 1 at 3.4–117, the studies themselves did not provide modified weighting functions for any of the mid-frequency whale species (sperm whales and Southern Resident killer whales) or low-frequency whales (blue, fin, humpback, and sei whales) evaluated in the LOA BiOp. Defendants explain in the draft Hawaii–Southern California Training and Testing ("HSTT") and Atlantic Fleet Training and

---

**3.** Plaintiffs also claim that the NMFS did not cite or discuss the beaked whale study in the LOA, nor did it reassess or change any of its previous take estimates for beaked whales in response to this information. Plaintiffs claim that the NMFS's failure to consider this and other relevant information renders the LOA arbitrary and capricious. The court will address this *infra*, in connection with the MMPA.

Testing ("AFTT") draft environmental impact statements, issued in May 2012, that the Navy used the data from the 2010 and 2011 dolphin studies to propose new (Type II) weighting functions for various cetaceans, including the six mid- and low-frequency whales evaluated in the LOA BiOp at issue in this case. *Id.* at 3.4–117–3.4–120; Ex. 2 at 3.4–102–104. The Navy's proposed new approach results in new "weighted" TTS and PTS thresholds, and new frequency-dependent weighting factors that must be applied to the exposed animals received sound level to determine whether the new TTS or PTS threshold has been exceeded. *Id.* at 3.4–118. Defendants argue that the 2010 and 2011 dolphin studies are relevant to the six ESA-listed whale species evaluated in the 2012 LOA BiOp only insofar as the studies support the new Type II weighting functions proposed by the Navy in the draft AFTT and HSTT EISs. Defendants stress that the studies themselves make no findings as to the six whales species nor do they propose any new acoustic impact criteria for those species.

Defendants concede that the dolphin studies "raised concerns about existing TTS thresholds and highlighted the need for new weighting functions that better account for marine mammal frequency sensitivity." Defendants' Reply, 7:18–19. However, they contend that it was consistent with the "best available data" standard for the NMFS to continue to rely on the existing methodology pending the development of new frequency-dependent weighting functions for the relevant species. *Id.* at 7:21–23. They argue that the Navy's proposal of new acoustic impact criteria in the May 2012 Draft EISs did not immediately discredit the existing criteria. *Id.* at 8:6–7. Finally, Defendants argue that the Navy proposed its new weighting functions and acoustic impact criteria in May 2012, five months before the 2012 LOA and challenged LOA BiOp were issued. As of October 2012, the NMFS's expert evaluation and the public review process required under NEPA and the MMPA were ongoing and incomplete. Thus, argue Defendants, the Navy's proposed new approach was not available for use in the October 2012 LOA BiOp.[4]

Finally, Defendants argue that Plaintiffs' assertion that the 2011 beaked whale study suggests a new behavioral threshold for other species listed under the ESA is unsupported. They note that the authors found that "beaked whales are particularly sensitive in terms of behavioral responses to acoustic exposure," AR Doc. G.13 at 7, and that the study makes no findings or conclusions about any other species.

Plaintiffs have challenged the NMFS's failure to consider the new information found in the scientific studies in the LOA BiOp. Plaintiffs do not argue that it is the interpretation of this information or the adoption of new thresholds in other training ranges that implicates the ESA's best available science requirement. Rather, they argue that it is the availability of the underlying new data and studies themselves that does so. Whether and how the same information may be finally interpreted and applied in other Navy training ranges is not controlling as to whether the Navy has a duty under the ESA to consider that information when it permits activities in the Northwest Training Range Complex.

---

4. The court required the parties to provide further briefing regarding the relevance of information provided in a news article about the issuance of final HSTT and AFTT environmental impact statements. (Doc. nos. 63, 64, 65.) The court finds that while generally informative, the briefs raise no new issues in the present case.

Defendants skirt the question of whether the information found within the scientific studies falls within the ESA "best available scientific data" standard in regard to the Navy's planned activities in the Northwest Training Range Complex. They do not argue that the information meets that standard for the Hawaii–Southern California and Atlantic areas, but does not meet it for the NWTR. The court has carefully reviewed the cases cited by Defendants and finds that none of them support the proposition that the Navy may ignore the "best available data" requirement because it has applied that data to another, similar project and has not reached a final interpretation of the data in that project. For example, in *Sierra Club v. Environmental Protection Agency*, 356 F.3d 296, 308 (D.C.Cir.2004), the Sierra Club brought a challenge under the Clean Air Act to the EPA's final actions regarding ozone control plans for the Washington, D.C. area, arguing in part that the relevant states had failed to incorporate into their plans the latest data regarding baseline emissions and predicting future emissions from motor vehicles. The EPA explained that it accepted the states' use of the earlier data because it was the most recent information available at the time the plans were prepared. *Id.* The new data was not available until one month before the states submitted their plans and long after those plans had been prepared. *Id.* The EPA further explained that data on emissions factors "are continually being improved." *Id.* Indeed, the data in question was the sixth incarnation of that set of information. The court rejected the Sierra Club's argument, holding that "[t]o require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes." *Id. Sierra Club v. Environmental Protection Agency* is readily distinguishable from the present case, in which there is no allegation that the data in question is simply the latest serial revision, and where the data was available years, not months, before the NMFS issued the LOA BiOp. The NMFS issued its LOA BiOp covering the remaining three years of training in October 2012— well after the new data from the 2010 and 2011 dolphin studies was available.

*North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F.Supp.2d 62 (D.D.C.2007) is similarly distinguishable. That case involved a challenge to an amendment to a fishery management plan which imposed tighter restrictions on the harvest of certain fish species. Interpreting the "best available data" standard under the Magnuson–Stevens Fishery Conservation and Management Act, the court held that even if the data used to support the amendment was weak, the criticism regarding the assessments drawn from the data was correct, and the collection methodology was weak, it was rational for the Secretary to press forward with the amendment. *Id.* at 85. The court found that, "the Secretary was not obliged to 'sit idly by' when faced with overfishing and overfished stocks simply because the data available to him may have been less than perfect." *Id.* at 86 (quoting *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F.Supp. 210, 220 (D.D.C.1990)). Thus, *N.C. Fisheries Ass'n, Inc. v. Gutierrez* addresses the discretion of the Secretary of Commerce to act on imperfect information to protect fish species. In the instant case, the contention is the opposite—that the NMFS has failed to address available information potentially applicable to species at risk.

After reviewing these cases, the parties' arguments and the administrative record, the court finds that it was an abuse of discretion in regard to its duty to use the best scientific data available for the NMFS to fail to consider the 2010 and 2011 dol-

phin studies in the 2012 LOA BiOp. The court will therefore grant Plaintiffs' motion for summary judgment as to this issue and deny Defendants' motion for summary judgment as to this issue. The court further finds, however, that Plaintiffs have not shown that the agency abused its discretion or acted arbitrarily or capriciously or otherwise not in accordance with law in regard to the 2011 study on beaked whales, a species that is not considered in the 2012 LOA BiOp. The court will therefore deny Plaintiffs' motion for summary judgment on this issue and grant Defendants' motion for summary judgment on this issue.

*Incidental Take Statement*

■ Within their discussion in their moving papers of the requirement under the ESA that the NMFS use the best available scientific and commercial information in its biological opinion, Plaintiffs contend briefly that, "[b]ecause the LOA BiOp fails to address the significant new information on whale sensitivity to sonar, its estimates of the amount of take in the ITS, like its jeopardy analysis, are not based on the best scientific and commercial data available. NMFS's failure to accurate[ly] and adequately quantify take violates the ESA and its implementing regulations and requires a remand." Plaintiffs' Motion, 20:23.5–25.5.

■ As set forth in detail above,[5] after issuing a no jeopardy biological opinion, the consulting agency must prepare an ITS if the proposed action will incidentally take members of a listed species and the take will not violate ESA Section 7(a)(2). *See* 16 U.S.C. § 1536(b)(4). "[A]n ITS is not part of the jeopardy analysis, but instead provides an exemption from [take] liability under Section 9 of the ESA." *Center for Biological Diversity v. U.S. Bureau*

*of Land Management*, 746 F.Supp.2d 1055, 1120 (N.D.Cal.2009), *vacated in part on other grounds*, 2011 WL 337364 (N.D.Cal. Jan. 29, 2011). When take of listed marine mammals is involved, the NMFS cannot issue an ITS unless the take has been authorized under MMPA, 16 U.S.C. § 1536(b)(4)(C), and the ITS must incorporate any mitigation measures prescribed by the MMPA take authorization. 16 U.S.C. § 1536(b)(4)(iii); 50 C.F.R. § 402.14(i)(1)(iii). In this case, the NMFS issued an ITS after rendering its updated no jeopardy opinion and after the take of ESA-listed marine mammals had been authorized under the MMPA. AR Doc. F.2d at 276–282. The ITS specifies as reasonable and prudent measures the mitigation required by the 2012 LOA and MMPA regulations, which the NMFS determined "are an adequate means of effecting the least practicable adverse impact on marine mammal species or stocks and their habitat." AR Doc. 6 at 37.

Defendants argue that any claim that the NMFS was required to specify additional reasonable and prudential measures in the ITS fails for several reasons. First, Defendants argue that the NMFS's authority to include any particular measure in the ITS is discretionary. They stress that reasonable and prudent measures are those "that the [NMFS] considers necessary or appropriate." 16 U.S.C. § 1536(b)(4)(ii). Second, Defendants argue that Plaintiffs do not identify any additional measures that the NMFS allegedly should have included that would "involve only minor changes" to the Navy's activities. Finally, Defendants argue that Plaintiffs' remaining arguments regarding mitigation lack merit, are based largely on speculation and conjecture, and do not support the claim that the NMFS was

5. *See supra* at 3.

required to specify additional reasonable and prudent measures in the ITS.

Plaintiffs state that Defendants have responded to an argument that they do not make regarding reasonable and prudent measures that the NMFS may include in its ITS. They state that their "challenge to the Incidental Take Statement is that the take numbers are too small to provide any useful measure or trigger for reinitiation of consultation." Plaintiffs' Opposition and Reply, 19:4–5. Because the court has found that the NMFS abused its discretion in failing to consider the best scientific information available in its 2012 LOA BiOp, its estimates of the amount of take in the ITS, like its jeopardy analysis, are not based on the best scientific and commercial data available. The court finds, therefore, that the NMFS abused its discretion in the issuance of the ITS. The court will grant Plaintiffs' motion for summary judgment on this issue and deny Defendants' motion for summary judgment on this issue.

*Evaluation of Full Effects of Agency Action*

▮ The Final Environmental Impact Statement for the action at issue in this case states that "[t]he proposed naval activities would continue for an indefinite period of time but this EIS/OEIS will be reviewed every five years for substantive changes and permits will be updated/renewed from regulatory agencies as necessary." AR Doc. B.25 at 1213.[6] Despite this description of the proposed naval activities as indefinite, the NMFS limited its analysis of the effects of the agency action to the initial five-year period permitted by the MMPA regulations. Plaintiffs contend that by doing so, the NMFS ignored its duty to evaluate all of the effects of the

action in its ESA jeopardy analysis. Plaintiffs argue that when an action will continue for longer than the initial proposed period, or when the effects of that action may extend beyond the initial time period, the NMFS is obligated to consider those longer-term effects in its biological opinion. Defendants dispute this contention, arguing that the NMFS appropriately defined the relevant "agency action" subject to ESA consultation as the five-year Final MMPA Rule, the 2012 LOA, and the specified training activities covered by the Final MMPA Rule and the 2012 LOA. AR Doc. F.2 at 3.

▮ The duty to consult under ESA Section 7(a)(2) is triggered by "affirmative agency action." *See Cal. Sportfishing Protection Alliance v. F.E.R.C.,* 472 F.3d 593, 595 (9th Cir.2006). In its biological opinion, the NMFS must identify the "agency action" subject to consultation and "analyze the effect of the entire agency action." *Conner v. Burford,* 848 F.2d 1441, 1453 (9th Cir.1988). In the challenged biological opinions for the NWTRC, the NMFS identified the relevant agency actions as the five-year Final MMPA Rule, the 2012 LOA, and the specified training activities covered by the Final MMPA Rule. Defendants defend its decision to do so by arguing as follows: 1) the Navy's activities described in the Final MMPA Rule require an MMPA permit because they incidentally take marine mammals, *see, e.g.,* AR Doc. B.6; 2) an MMPA permit may not extend beyond five years; 3) in the absence of a national defense exemption, the Navy's activities cannot continue as specified in the Final MMPA Rule beyond five years unless the NMFS issues a new take authorization; and 4) the five

---

**6.** Defendants state in their papers that, "[t]he Navy has trained in the NWTRC for decades using largely the same sonar systems in use today." Defendants's Motion and Opposition, 1:5–6.

year period of the Final MMPA Rules is thus the entire agency action that is permitted under the MMPA, 16 U.S.C. § 1371(a)(5)(A)(i)(1). Defendants therefore conclude that the term of the "action" subject to ESA consultation in this case is dictated by the five-year term of the MMPA take authorization and the covered Navy training activities. Defendants contend that to hold otherwise would thwart Congress's intention, cited above, that the decision processes under the MMPA and the ESA be coordinated and integrated to the maximum extent possible.

■ " 'Action' means all activities or programs of any kind authorized, funded, or carried out by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Examples of actions given in the regulation include "the granting of licenses, contracts, leases, easements, rights-of-way, permits or grants-in-aid." 50 C.F.R. § 402.02(c). The meaning of "agency action" is "determined as matter of law by the Court, not by the agency." *Greenpeace v. Nat'l Marine Fisheries Service,* 80 F.Supp.2d 1137, 1150 (W.D.Wash. 2000).

"There is little doubt that Congress intended to enact a broad definition of agency action in the ESA." *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 (9th Cir.1994). In *Pacific Rivers,* the Ninth Circuit found that certain Land Resource Management Plans ("LRMPs") developed by the United States Forest Service constituted ongoing agency actions throughout their duration, not only at the time they were adopted or if they were revised or amended in the future. The court explained that, "[t]he LRMPs are comprehensive management plans governing a multitude of individual projects, indeed, every individual project planned in both national forests involved in this case is implemented according to the LRMPs."

*Id.* at 1053. The court concluded that, "because the LRMPs have an ongoing and long-lasting effect even after adoption, we hold that the LRMPs represent ongoing agency action." *Id.* Thus, the court affirmed the district court's ruling that the Forest Service was required to consult with the NMFS regarding a species of salmon listed as "threatened" under the ESA after the LRMPs were adopted. *Id.*

■ Similarly, in *Greenpeace v. Nat'l Marine Fisheries Service,* 80 F.Supp.2d at 1139, environmental groups brought an action challenging Fishery Management Plans ("FMPs") for groundfish fisheries in the Bering Sea and Gulf of Alaska. The FMPs authorized and regulated all activities involved in fishing in the regulated areas. At issue was the underlying biological opinion, which was limited to the effect of a single year's fishing on the endangered Stellar sea lion. The district court found that the FMPs in their entirety constituted ongoing agency action subject to consultation under ESA section 7. *Id.* at 1144. Thus although the district court agreed that the adoption of the FMPs and the authorization of the yearly fishery were separate and discrete agency actions, it rejected the argument that the biological opinion at issue was properly limited to addressing the authorization of the 1999 fishery only. *Id.* at 1145–46. Rather, the court held, the ESA required a comprehensive biological opinion coextensive in scope with the FMPs. *Id.* at 1145. The court held that, "an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue in a biological opinion." *Id.* at 1146.

In *American Rivers v. U.S. Army Corps of Engineers,* 271 F.Supp.2d 230, 255 (D.D.C.2003), environmental groups brought an action alleging that the manner in which the Army Corps of Engineers

operated the dam and reservoir system on the Missouri River and the issuance by the FWS of a supplemental biological opinion related to that operation violated the ESA. The district court found that although the FWS was "required to consider the Corps' proposed action in the context of its overall management of the Missouri River Basin," the FWS had considered the effects of the revised annual operating plan "only in the context of one isolated year." *Id.* at 254–55. In finding that the plaintiffs had met their burden of demonstrating a substantial likelihood of succeeding their claim that the FWS had violated the ESA, the district court explained:

> Nor can there be any question that the ESA requires that all impacts of agency action—both present *and* future effects on species—be addressed in the consultation's jeopardy analysis. *See Conner v. Burford,* 848 F.2d 1441, 1457–58 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) (the ESA "does not permit the incremental-step approach" of consultation because "biological opinions must be coextensive with the agency action.").
>
> Moreover, there are significant reasons to reject the segmentation FWS has utilized in this case. If FWS were allowed to apply such a limited scope of consultation to all agency activities, any course of agency action could ultimately be divided into multiple small actions, none of which, in and of themselves, would cause jeopardy. Moreover, such impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of their overall activities on protected species. The ESA requires more; it "requires that the consulting agency scrutinize the *total scope* of agency action." *North Slope Borough v. Andrus,* 486 F.Supp. 332, 353 (D.D.C.1980), *aff'd in part,*

*rev'd in part on other grounds,* 642 F.2d 589 (D.C.Cir.1980) (emphasis added).

*American Rivers,* 271 F.Supp.2d at 255 (emphasis in original).

Finally, in *Wild Fish Conservancy v. Salazar,* 628 F.3d 513 (9th Cir.2010), the Ninth Circuit addressed the appeal of an order granting summary judgment to the defendants in a case challenging the operation and management plan of the Leavenworth National Fish Hatchery. The hatchery was obligated to consult with the FWS to ensure that its operations were not jeopardizing the continued existence of bull trout, after that species was listed as threatened under the ESA, and also for authorization for any incidental takings. *Id.* at 519. In its request for consultation submitted to the FWS, the hatchery defined the agency action as the operation and maintenance of the hatchery from 2006 to 2011. *Id.* In the relevant 2008 Biological Opinion issued by the FWS, it explained that the hatchery relied on this five-year time period "because it planned two modifications to Hatchery operations during and soon after that period that would require it to reinitiate formal consultation." *Id.*

The Ninth Circuit concluded that the decision to limit the analysis of the 2008 Biological Opinion to a five-year term of operations and management was arbitrary and capricious, and that the FWS committed legal error by limiting the scope of the action to five years. *Id.* at 532. In so doing, the court discussed at length the importance of the definition of the scope of an action for analysis of the adequacy of a biological opinion under the ESA. It reviewed its decision in *Conner v. Burford,* 848 F.2d at 1453, in which it had "rejected biological opinions addressing only the first, preliminary state in a multistage project." *Wild Fish Conservancy,* 628 F.3d

at 521. In that case, the FWS issued biological opinions for two national forests, before leases for oil and gas exploration were issued. *Id.* The FWS considered only the effects of the leases themselves, not the affects of the planned exploration. *Id.* "Instead of comprehensive biological opinions at the leasing stage, the Service included in the leases stipulations requiring additional environmental consultation prior to any 'surface-disturbing activities.'" *Id.* at 522 (quoting *Conner,* 848 F.2d at 1455).

The Ninth Circuit explained in *Wild Fish Conservancy* that the limited scope of the biological opinions in *Conner* violated the FWS's obligation "to analyze the effect of the entire agency action." *Wild Fish Conservancy,* 628 F.3d at 522 (quoting *Conner,* 848 F.2d at 1453). That agency action including not only leasing, but also "all post-leasing activities through production and abandonment." *Wild Fish Conservancy,* 628 F.3d at 522 (quoting *Conner,* 848 F.2d at 1453). Thus, because the FWS had failed to meet its obligation to "'prepare, at the leasing stage, a comprehensive biological opinion' considering 'all phases of the agency action,'" the biological opinions were found to be invalid. *Wild Fish Conservancy,* 628 F.3d at 522 (quoting *Conner,* 848 F.2d at 1454). Turning to the facts before it in *Wild Fish Conservancy,* the Ninth Circuit rejected the defendants' argument that *Conner* was distinguishable because the five-year term of operations and management of the hatchery was the entire agency action. *Wild Fish Conservancy,* 628 F.3d at 522. It stated, "[w]hat the Service's argument does not acknowledge is that the Hatchery has been operating for seventy years and is expected to continue operating into the future. The Hatchery simply made a decision, endorsed by the Service, to define the action as a five-year term of operations,

when it might as easily have chosen a thirty-year term or a one-year term." *Id.*

Here, Defendants contend that the NMFS rationally limited the biological opinion at issue to the five-year Final MMPA Rule. They argue that because each five-year period requires a new take authorization under the MMPA, the each five-year period necessarily constitutes a separate "action" for the purposes of the ESA. In response to Plaintiffs' quotation from the Final EIS, Defendants argue that they have never admitted that the specific activities covered by the MMPA Rule will continue indefinitely.

The court finds that to limit review under the ESA to the period of the five-year Final MMPA Rule ignores the realities of the Navy's acknowledged long-term, ongoing activities in the NWTRC. In its Request for Letter of Authorization For The Incidental Harassment Of Marine Mammals Resulting From Navy Training Activities Conducted Within The Northwest Training Range Complex dated September 2008, the Navy states that it "believes that risk to marine mammals from sonar training is low." AR. Doc. B.6 at 7890. In support of that belief, the Navy asserts that "MFA/HFA sonar use in the NWTRC is not new given the current hull-mounted sonar employs the same basic sonar equipment and having [sic] the same output for over approximately 30 years." *Id.* Further, in the Final Environmental Impact Statement dated September 2010, the Navy states that "[t]he proposed naval activities would continue for an indefinite period of time." AR B.25 at 1213.

These realities make this case analogous to those in *Wild Fish Conservancy.* As discussed by the Ninth Circuit in that case, the shorter the delineation of the scope of an action, the less likely the NMFS is to find that the action impacts the viability of a threatened (or endangered) species.

*Wild Fish Conservancy,* 628 F.3d at 522. That is, a series of short-term analyses can mask the long-term impact of an agency action. The ESA regulations provide in part that, "[j]eopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. As the Ninth Circuit found, there could be "some impact," but not an appreciable impact, "in each of several subdivided periods" of an operation that cumulatively would have "an undeniable impact." *Id.* at 523. This is caused in part by the fact that the environmental baseline effectively resets at the beginning of each period. *Id.* at 523; *see* 50 C.F.R. § 402.02 ("Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat ... that will be added to the environmental baseline."). The same issues exist here, in that the segmented analysis is inadequate to address long-term effects of the Navy's acknowledged continuing activities in the area.

 Congress intends that the decision processes under the MMPA and the ESA be coordinated and integrated to the maximum extent possible. The court finds, however, that this intention cannot lawfully be used as a basis for nullifying Congress' equally important intention, "to enact a broad definition of agency action in the ESA." *Pacific Rivers Council,* 30 F.3d at 1054. Defendants have cited to the court no authority mandating that the "action" subject to ESA consultation coincide with the term of the MMPA Rule. It is undisputed that the requirements of both statutes must be adhered to and individually satisfied. The fact that the decision making under the two statutes may not be

completely integrated in a particular case does not negate the duty to comply with both of them.

Under these circumstances, and in light of the case law discussed above, the court finds that it was an abuse of discretion for the NMFS to define the "agency action" to be reviewed under the ESA as the five-year period permitted under the MMPA. It is not for the court to dictate how long the term of the ESA analysis should be in this case. *See Wild Fish Conservancy,* 628 F.3d at 524. It must, however, be long enough for the NMFS to make a "meaningful determination" of whether the Navy's ongoing activities are "likely to jeopardize the continued existence of" any listed species or to destroy or adversely modify critical habitat designated for such species. The court will grant Plaintiffs' motion for summary judgment on this issue and deny Defendants' motion for summary judgment on this issue.

*Reliance on Mitigation Measures*

 Plaintiffs contend that the NMFS improperly based its no jeopardy and no adverse modification conclusions in its ESA analysis on the mitigation measures required under the Final MMPA Rule, which they contend are inadequate and ineffectual. Plaintiffs describe these mitigation measures as consisting "primarily of visually identifying listed species within a very small safety zone around the Navy's sonar sources, and making temporary adjustments to training activities to avoid acute injury of detected individual animals." Plaintiff's Motion, 24:8–10. Plaintiffs claim that despite the acknowledgment in other contexts of the deficiencies of visual detection, the NMFS did not require any additional mitigation or monitoring measures. Further, they claim that the NMFS did not consider additional protections for the endangered Southern Resident killer whales. Plaintiffs thus contend

that NMFS's failure to independently analyze whether visual monitoring would address all of the impacts of the Navy's actions—and to require mitigation measures necessary to avoid those impacts—does not comply with its duties to consider all relevant factors and to base its decisions on the best available science.

Defendants assert that while the LOA BiOp describes the mitigation required under the Final MMPA Rule, the NMFS did not rely on mitigation measures in conducting its jeopardy analysis and in reaching its no jeopardy conclusion. Rather, Defendants claim, the NMFS based its analysis on the Navy's take estimates and the NMFS's alternative exposure estimates, neither of which utilizes or accounts for mitigation. Defendants claim that in its substantive analysis, the NMFS considered mitigation for the sole purpose of estimating what portion of the Navy's estimate of killer whales takes might be ESA-listed Southern Resident killer whales. *See* AR Doc. F.2d at 255. Defendants assert that the NMFS did not rely on mitigation to avoid all impacts on that or any other species, nor did the NMFS conclude that but for mitigation, the Navy's activities would result in jeopardy.

The court's review of the portions of the administrative record cited by the parties supports Defendants' claim that the NMFS did not consider mitigation in reaching its no jeopardy conclusion. In the 2012 LOA BioOp, the NMFS's analysis of the effects of the Navy's proposed activities does not rely on mitigation efforts by the Navy to avoid or lessen impacts on the effected species. *See* AR Doc. F.2 at 50–52.

Plaintiffs recharacterize their contention in their Opposition and Reply, stating that they "argue[ ] that NMFS's ultimate no jeopardy and no adverse modifications conclusions stand or fall based on the Navy's entire action, including its standard mitigation measures, which NMFS itself has found inadequate. Whatever label you put on them—an integral part of the agency action or mitigation or something else—reliance on these measures was arbitrary and capricious." Plaintiffs' Opposition and Reply, 14:8–12. Plaintiffs argue that because the mitigation measures are part of the proposed action, the NMFS would have failed to consider the entire agency action if it ignored these measures in its analysis.

Plaintiffs cite to the court a single example in which the NMFS considered mitigation in concluding what effect the Navy's activities might have on a particular species. This is the instance acknowledged by Defendants: to estimate what portion of the Navy's total killer whale take might represent Southern Resident killer whales. In regard to Southern Resident killer whales, the 2012 Biological Opinion provides:

> The U.S. Navy estimated that 13 killer whales (NMFS Permits Division estimated 14 killer whales) might be exposed to active sonar associated with the training activities it proposes to conduct on the Northwest Training Range Complex and exhibit behavioral responses that would qualify as "take," in the form of behavioral harassment, as a result of that exposure. This estimate did not separate southern resident killer whales from other killer whales distinct population segments that reside in the action area. Further, this estimate did not account for the mitigation activities, such as lookouts and watchstanders. Killer whales travel in groups (average group size is 6.5 animals), have conspicuous coloring, and pronounced dorsal fins that together increase the likelihood that they would be detected by Navy lookouts.

. . .

Given that killer whales are likely to be visible to watchstanders [7] and that individuals from the southern resident killer whale populations are more likely to be found in Puget Sound rather than off shore areas, we assume that only about 10 percent of the Navy's estimate of killer whales exposed to active sonar would be from the southern resident killer whale DPS. Because the U.S. Navy has chosen to exclude mid-frequency active sonar training in Puget Sound from the scope of their proposed action, we assume that any southern resident killer whales that might be exposed to mid-frequency active sonar would not be exposed in Puget Sound. Therefore, we assume that all of these exposures would occur off the coast of Washington, Oregon, or northern California.

A.R. Doc. F.2 at 246.

Plaintiffs assert that the argument that mitigation measures need not be 100% effective, "cannot be seriously applied to Southern Resident killer whales." Plaintiff's Opposition and Reply, 16:15–16. Plaintiffs cite a NMFS finding that this population of killer whales is so fragile that, "the loss of a single individual, or the decrease in the reproductive capacity of a single individual, is likely to reduce appreciably the likelihood of survival and recovery." Biological Opinion on the "Effects of the Pacific Coast Salmon Plan on the Southern Resident Killer Whale (*Orcinus orca*) Distinct Population Segment" at 56 (May 5, 2009), *see also* "Biological Opinion and Conference Opinion on the Long–Term Operations of the Central Valley Project and State Water Project" at 573 (June 4, 2009). Plaintiffs also cite emails from NMFS officials discussing the need

to give particular consideration to the effects of the Navy's action on Southern Resident killer whales. AR Doc. A.23 at 3551 (Southern Resident killer whales "are probably the most vulnerable to the stressors associated with the proposed action (because of their limited distribution, social ecology, small population size, and the wide array of stressors they are exposed to) and the most sensitive (because of their hearing sensitivity."); AR Doc. A.23 at 3620 ("Given [the Southern Resident killer whales'] status and the critical habitat, I think it is very important that we carefully consider ways to further reduce impacts."). Plaintiffs argue that there are two basic problems with the NMFS's reliance on visual mitigation to "prevent harm" to Southern Resident killer whales, because there are two different "kinds of effects" the Navy must avoid. The first of these effects is direct impact to individual whales, and the second is the indirect effects that result in the displacement of whales or avoidance behaviors.

Plaintiffs argue that relying on watchstanders to spot and identify the whales "is by no means a guarantee that the Navy will avoid or minimize exposures." Plaintiffs' Opposition and Reply, 16:8–10 (citing *Natural Resources Defense Council, Inc. v. Winter*, 645 F.Supp.2d 841, 850, 854 (C.D.Cal.2007), *injunction modified by Natural Resources Defense Council, Inc. v. Winter*, 508 F.3d 885 (9th Cir.2007)). This standard is not applicable to the present case, as the *Winter* case is distinguishable on its facts. In *Winter* the Navy found that its proposed use of mid-frequency active sonar off the coast of Southern California between 2007 and 2009 would not cause a significant impact on the environment. *Winter*, 645 F.Supp.2d at 846. The Navy therefore concluded that it

7. "Watchstanders" are Navy lookouts who have completed specialized training in the detection of marine mammals in the vicinity of their vessel. A.R. Doc. F.2 at 24.

was not required to prepare an environmental impact statement under the National Environmental Policy Act. *Id.* In response to the plaintiffs' contentions to the contrary, the district court discussed the adequacy of the Navy's mitigation measures. In so doing, the district court found that, "[a]n agency may avoid the requirement to prepare an EIS by adopting mitigation measures sufficient to eliminate any substantial questions over the potential for significant impact on the environment." *Id.* at 848. The court found, however, that "[t]he mitigation measures Defendants have proposed in the instant case are far from sufficient to obviate the need for an EIS." *Id.* at 850.

In the present case, the Navy went through formal consultation with the NMFS, which is required under the ESA when the agency finds that adverse effects to a listed species or critical habitat are likely. *See* 50 C.F.R. § 402.14(a)-(b). Thus, the Navy did not claim, as it did in *Winter*, that its mitigation measures were sufficient to obviate the need for the next level of review. Therefore, *Winter* provides no authority for the level of efficacy required of the mitigation measures in the present case.

Plaintiffs also rely on *Preserve Our Island v. U.S. Army Corps of Engineers*, No. C08–1353RSM, 2009 WL 2511953 (W.D.Wash. Aug. 13, 2009), in which the plaintiffs challenged the issuance of a permit by the Army Corps of Engineers ("the Corps") for the construction of a barge-loading facility on the shore of Maury Island in Puget Sound. The plaintiffs alleged in part that the agency actions leading to the issuance of the permit, and the permit itself, violated Section 7(a)(2) of the ESA. The ESA-listed species that were at issue regarding possible effects of the project were Puget Sound Chinook, bull trout, and Southern Resident killer whales ("SR

Orcas"). *Id.* at * 1. The Corps' informal ESA consultation with the NMFS resulted in a finding of not likely to affect the SR Orca or its critical habitat. *Id.* at *2. The plaintiffs brought an action, part of which was a challenge to that finding.

The court found that it was improper to reply on visual monitoring "as a basis for determining no adverse effect" on the SR Orca. *Id.* at *13. It found specifically that, "[d]isplacement of the Orcas from important feeding areas would itself be an adverse effect, one that the monitoring program does not address in any way." *Id.* Plaintiffs rely on this statement to argue that, "[h]ere, NMFS relied on the visual monitoring program in its jeopardy analysis to minimize the numbers and extent of individual Southern Resident killer whales exposed and to minimize any type of harm. Both kinds of reliance are unjustified." Plaintiffs' Opposition and Reply, 18:17–20.

In so arguing, Plaintiffs ignore the context of the court's statement in *Preserve Our Island.* It was made as a precursor to the court's conclusion that:

> the informal consultation process resulted in the arbitrary and capricious issuance of "no adverse effect" determinations in the face of scientific evidence in record which suggests specific and serious effects on Chinook and SR Orcas. The Court finds that the Corps violated the plain meaning and intent of Section 7(a)(2) of the ESA by ignoring or disregarding evidence that would require formal consultation with the Service. The Court shall grant in part plaintiff's motion for summary judgment on the ESA claims and remand to the agency for formal consultation and the preparation of a Biological Opinion which includes full and meaningful consideration of the Chinook and SR Orca Recovery Plans.

*Preserve Our Island,* 2009 WL 2511953 at *14. Thus, *Preserve Our Island* involved

informal consultation, which resulted in a finding that the proposed permit was not likely to adversely affect listed species. Therefore, the agencies did not conduct formal consultation and the NMFS did not issue a biological opinion.

Here, because of the likelihood of adverse effects, the NMFS and the Navy engaged in formal consultation. As a result, the Navy was not required to find that all adverse effects on listed species would be avoided. Rather, the NMFS was required to issue a biological opinion evaluating whether the adverse effects were likely to rise to the level of jeopardy. 16 U.S.C. § 1536(b)(3)(A). Thus, Plaintiffs are incorrect in asserting that the NMFS was required to "independently analyze whether visual monitoring would address all of the impacts of the Navy's actions—and to require mitigation measures necessary to avoid those impacts." Plaintiffs' Opposition and Reply, 18:21–24. That was not the standard to be met under the ESA.

In this case the NMFS found in the Final MMPA Rule that the required mitigation "is likely effective at avoiding exposure to injurious levels of sound, and does succeed in reducing exposures of marine mammals (to varying degrees, depending on the species and environmental conditions) to higher levels of sound that might be associated with more severe behavioral responses." AR Doc. B.6 at 45. As Defendants argue, Plaintiffs have not provided any citations to the record demonstrating that the Navy's activities are "reasonably certain" to have effects on killer whales that the NMFS failed to consider. *See* 50 C.F.R. § 402.02 ("indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.") The court therefore rejects as legally unsupported Plaintiffs' contention that reliance on visual mitigation regarding

Southern Resident killer whales was arbitrary or capricious, in regard to either direct or indirect effects of the Navy's activities. Finally, because the NMFS reached its no jeopardy conclusion without reliance on the mitigation measures required under the Final MMPA Rule, consideration of those measures would simply have further supported the conclusion.

Based on the above, the court concludes that Plaintiffs have not met their burden of demonstrating that the NMFS abused its discretion or acted arbitrarily, capriciously or otherwise not in accordance with law in regard to the mitigation measures required under the Final MMPA Rule. Accordingly, the court will deny Plaintiffs' motion for summary judgment on this issue and grant Defendants' motion for summary judgment on this issue.

*Consideration of Aggregate Effects of the Action*

■ An agency's jeopardy analysis under the ESA, presented in a biological opinion, includes evaluation of both direct and indirect effects of the action. 50 C.F.R. §§ 402.02, 402.14(g)(3). "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably likely to occur." *Id.* at § 402.02. Plaintiffs contend that the NMFS's analysis of the impacts of the Navy's activities failed to consider the cumulative or long-term impacts to ESA-listed mammals from repeated exposure. Specifically, Plaintiffs contend that, the Five Year BiOp does not contain an analysis of "the cumulative impacts to individuals or to the species of repeated sonar exposures over the five-year term of the BiOp or whether the aggregate effects of that exposure and other harm to the species would jeopardize any listed species." Plaintiffs' Motion, 32:12–15. Plaintiffs argue that instead, the NMFS limited its

analysis to the annual impacts of take, which risks masking effects that may accumulate or could otherwise be significant over the longer time period.

Defendants dispute this contention, arguing that in the 2012 LOA BiOp, the NMFS explicitly evaluated the potential for aggregate effects and rationally concluded that such effects were unlikely. Defendants provide three main citations to the administrative record. Defendants first cite the 2012 LOA BiOp itself at pages 265–80. AR F.2. This portion of the LOA BiOp begins with Section 5.5, which is entitled, "Potential for Accumulative Impacts." *Id.* at 265. While acknowledging that it "did not explicitly discuss the potential accumulative impacts of the annual 'take' estimates in our 2010 Programmatic Biological Opinion," the NMFS states that it "explicitly considered those potential cumulative impacts as part of our consultation (as demonstrated in the consultation record), and now explain our assessment in more detail." AR F.2 at 265. The NMFS explains the conclusions it reached in regard to impacts or effects that accumulate in the environment, and impacts or effects that represent the response of individuals, populations or species to that accumulation of stressors or to sequences of exposure to stressors. *Id.* at 265–66. The NMFS finds that "the vast majority of impacts expected from sonar exposure and underwater detonations are behavioral in nature, temporary and comparatively short in duration, relatively infrequent, and not of the type or severity that would be expected to be additive for the small portion of the stocks and species likely to be exposed either annually or over the five-year duration of the MMPA regulations." *Id.* at 266. It states that it did not expect predicted multiple "takes" "to have any additive, interactive, or synergistic effect on the individual animals, the population(s) those individuals repre-

sent, or the species those population(s) comprise." *Id.* Finally, the NMFS states:

[w]ith respect to threatened and endangered marine mammals, our conclusion that the aggregate number of exposures over the five-year duration of the MMPA regulations or the three-year duration of the LOA is unlikely to result in accumulated adverse impacts that are likely to jeopardize the continued existence of any of the affected species is also supported by the negligible impact determination contained in the MMPA rulemaking. [Citation omitted.] Our initial conclusion is further supported by the fact that the level of take that has occurred thus far under the five-year MMPA regulations (and thus the estimated aggregate level of take) is substantially lower than originally anticipated in both the 2010 Programmatic Biological Opinion and the MMPA regulations.

*Id.* at 267.

Defendants next cite a copy of an email dated April 28, 2010. AR Doc. A.4 at 615–16. The text of the email contains a detailed discussion of conducting a cumulative impact analysis. *Id.* Finally, Defendants cite a portion of the Federal Register dated July 13, 2009, which contains the proposed Rule for the five-year regulations authorizing Naval activities in the NWTRC. AR Doc. B.65 at 4679–80. The pages cited by Defendants contain a discussion of possible effects of the Navy's activities on marine mammals, both generally and by species. *Id.* Included in that discussion is a conclusion regarding the impact the Navy's activities will have on the stock of each species. *Id.* at 4681–4685.

After a detailed review of the parties' entire arguments and the citations therein, along with the administrative record as a

whole, the court finds that Plaintiffs have failed to carry their burden of demonstrating that the NMFS's evaluation of long-term or cumulative impacts of the Navy's action was an abuse of discretion or arbitrary, capricious or otherwise not in accordance with law. The NMFS's analysis is presumed valid, and Plaintiffs' argument that the NMFS has "failed to demonstrate any explicit analysis of long-term or cumulative impacts of the Navy's training" is unavailing. Contrary to Plaintiffs' claims, the court finds that the NMFS did comply with its duty to consider the potential for aggregate or long-term effects of the Navy's action over the term of the Five Year BiOp and articulated a rational basis for its conclusions. Thus, the court finds that the NMFS did not fail to act in accordance with law in regard to evaluating the long-term or cumulative impacts of the Navy's action *as it was then defined.* The court will deny Plaintiffs' motion for summary judgment on this issue and grant Defendants' motion for summary judgment on this issue.

*Allowance of Conduct Prohibited by MMPA*

 Plaintiffs contend that the NMFS's Letter of Authorization, the instrument that authorizes the take of marine mammals, does not accurately reflect the number of takes that will occur in the NWTR over the next three years. They claim that the LOA allows the Navy to conduct activities that will result in more takes than analyzed and authorized in the Five Year Regulations. Plaintiffs argue that such take is prohibited by the MMPA and that the NMFS's authorization is not in accordance with the law.

In support of this contention, Plaintiffs rely on their claim, discussed *supra,* that the NMFS failed to use the best available scientific information in reviewing the Navy's activities in the NWTR. Noting

that this scientific information was available more than a year before the NMFS finalized its Rule at issue in this case, Plaintiffs state that the NMFS has not used this information to calculate exactly how many more marine mammals are being affected by the Navy's use of sonar in the NWTR than previously thought. They argue that there can be no dispute that the new information shows that the thresholds for harm are significantly lower than those the NMFS used to estimate the number of take that will occur. Plaintiffs cite a significant increase in estimated take from Navy sonar activities in Hawaii and Southern California and for the Atlantic Fleet after new thresholds derived from the information were applied. *See supra* at *997–98.

Plaintiffs also cite and discuss the estimated take of harbor porpoises and beaked whales as examples of the significance of the new information. Harbor porpoises are more sensitive to sound than most other marine mammals, resulting in them experiencing more than 91 percent of all take from the Navy's activities in the NWTR. AR Doc. B.6 at 41, 51. Plaintiffs argue the new information shows that harbor porpoises will start suffering temporary hearing loss at 152 dB and permanent hearing loss at 172 dB. Mashuda Decl., Exh. 1 at 3.4–120. The NMFS assumes in the Final MMPA Rule that the relevant sound levels are 195 dB and 215 dB. AR Doc. B.25 at 1774–75.

In regard to beaked whales, Plaintiffs cite the 2011 study discussed above which concluded that beaked whales are even more sensitive to sonar than previously thought and that the results of the study "support a lower acoustic threshold of disturbance for beaked whales than is currently applied in the US." AR Doc. G.13 at 7. Plaintiffs argue that study could not have been clearer, and was available a

year and a half before the NMFS issued the October 12 LOA. Plaintiffs claim that Defendants ignored this study, failing even to explain why the NMFS decided to continue to rely on old information. *See Sierra Club v. U.S. E.P.A.,* 671 F.3d 955, 968 (9th Cir.2012) (finding that an agency's "failure to even consider the new data and to provide an explanation for its choice ... was arbitrary and capricious" and that courts "should not silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current complied data.")

Plaintiffs rely on *Kokechik Fishermen's Ass'n v. Sec'y of Commerce,* 839 F.2d 795, 800 (D.C.Cir.1988), wherein the court analyzed whether it was legal for the Secretary of Commerce to "issue a permit allowing incidental taking of one protected marine mammal species knowing that other protected marine mammal species will be taken as well," but excluding them from the permit for the activity. In holding that the Secretary does not have the authority to issue a permit under the MMPA that authorized less than the actual take caused by the permitted activity, the court tied its decision to the regulatory scheme of the MMPA, which:

> effects a moratorium on the taking of marine mammals. Congress decided to undertake this decisive action because it was greatly concerned about the maintenance of healthy populations of all species of marine mammals within the ecosystems they inhabit. Exceptions to this moratorium clearly evidence a concern with the relationship between the activity engaged in and its effect on marine mammals and their ecosystem. It is the duty of the Secretary to take a systematic view of an activity's effect on marine mammals. A view that the per-

mit process functions merely to determine which takes will be exempted from civil penalties is inconsistent with this duty because it allows—subject to the civil penalty price–illegal taking of other protected marine mammals.

*Id.* at 801–02. The District of Columbia Circuit affirmed the decision of the district court preliminarily enjoining the Secretary of Commerce from issuing a permit to a group of commercial fishermen. *Id.* at 802–03. Plaintiffs argue that similarly, the NMFS's LOA allows an activity that it knows, based on the best available science, will result in more protected marine mammals being taken and harmed more severely than authorized by the Final MMPA Rule and the LOA itself. They conclude that, as with the LOA BiOp, the agency's failure to use this information to issue a letter of authorization that complies with the MMPA is a violation that justifies remand.

In response to Plaintiffs' basic contention that the LOA does not accurately reflect the number of takes that will occur in the NWTR, Defendants rely on their previously stated arguments addressing the ESA's best available scientific information standard. The court has rejected those arguments.[8] Defendants directly address Plaintiffs' argument regarding the 2011 beaked whale study, first asking the court not to consider it because it was raised for the first time in the Opposition and Reply. Because of the unique situation of the briefing of this APA case, in which the parties have filed briefs serving simultaneously as oppositions and replies, Defendants have had the opportunity to respond to Plaintiffs' argument. Accordingly, the court will address it.

Defendants argue that Plaintiffs' claim that the NMFS ignored the 2011 beaked

---

8. *See supra* at 14–15, 129 S.Ct. 365, 370.

whale study or that the study invalidates the LOA's authorization of beaked whales, lacks merit. They state that the NMFS and the Navy conduct annual "adaptive management meeting for multiple MMPA rules governing Navy sonar testing and training." Defendants' Reply, 11:8–9. They claim that during their October 2011 meeting, the NMFS and the Navy "considered the 2011 study and rationally determined that it did not provide a basis for prescribing any additional mitigation or monitoring." In support of this claim, Defendants cite the Stone Declaration, Exhibit A at 10. That page of Exhibit A includes the minutes from a discussion of the 2011 beaked whale study. The minutes record that the NMFS "does not have a current recommendation," while the Navy opined that "right now there is probably not enough data to statistically support this analysis." *Id.*

Defendants also argue that if Plaintiffs believe that the 2011 study requires a modification of the methodology used in the Final MMPA Rule to quantify beaked whale take, Plaintiffs' remedy is to petition the NMFS for an amendment of that Rule, not to challenge the LOA issued under the Rule. They argue that a letter of authorization is not the proper vehicle for amending the methodology used to quantify take in the controlling regulation. They note that the issuance of a letter of authorization is based on the NMFS's determination that "the level of taking will be consistent with the findings made for the total allowable taking under the [governing] regulations." 50 C.F.R. § 216.106(a). Thus, they argue that the regulation itself must be modified, "after notice and opportunity for public review." *See* 5 U.S.C. § 553(e) (requiring agencies to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule").

Defendants assert that Plaintiffs have not petitioned the NMFS for an amendment of the Final MMPA Rule at issue here. They speculate that this is because Plaintiffs know that the NMFS is already engaged in two rulemakings, in part to determine whether the 2011 study warrants a change in the method for estimating beaked whale behavior. These two studies involve the Atlantic Fleet and the Hawaii and Southern California Range Complexes. *See* 78 Fed.Reg. at 7105 (proposed five-year MMPA regulations for the Atlantic Fleet); 78 Fed.Reg. 6978, 7015 (proposed MMPA regulations for Hawaii and Southern California range complexes). Defendants also assert that the Final MMPA Rule for the NWTRC expires in November 2015, and the Navy has already initiated the NEPA process to support an application for new MMPA take regulations. *See* 77 Fed.Reg. 11497 (Feb. 27, 2012). Defendants assert that "[a]ny new beaked whale take threshold the NMFS may adopt at the conclusion of the ongoing rulemakings for the Atlantic Fleet and the Hawaii—Southern California range complexes may be incorporated into the Navy's application and any new MMPA take authorization for the NWTRC." Defendants' Reply, 10:28–3.

The court finds that the NMFS's present work in rulemakings involving the Atlantic Fleet and the Hawaii and Southern California Range Complex does not address the issue of its compliance with the MMPA in issuing the LOA for the NWTRC. Nor is the issue addressed by the fact that any new beaked whale take threshold the NMFS *may* adopt for the Atlantic Fleet and the Hawaii and Southern California Range Complex *may* be incorporated into any new MMPA take authorization for the NWTRC when the Final MMPA Rule for the NWTRC expires in November 2015, just over two years from now.

· However, based on the parties' arguments, its review of the administrative record, and its above analysis of Plaintiffs' claim that the NMFS failed to use the best available scientific information available, the court finds that Plaintiffs have failed to carry their burden of demonstrating that the NMFS abused its discretion or acted arbitrarily or capriciously or otherwise not in accordance with law in issuing the LOA. As Defendants argue, a letter of authorization issued under the MMPA must be consistent with the regulations issued for the particular activity. *See* 50 C.F.R. § 216.106(a). Here, the regulations in question are found in the Final MMPA Rule governing the take of marine mammals from November 2010 through November 2015. Plaintiffs do not claim that the LOA is inconsistent with the Final MMPA Rule. Further, the case Plaintiffs rely on, *Kokechik Fisherman*, addresses the issuance of a five year permit equivalent to the Final MMPA Rule, not to the LOA which Plaintiffs challenge. Thus, it does not address the precise issue presented here. Therefore the court will deny Plaintiffs' motion for summary judgment on this issue and grant Defendants' motion for summary judgment on this issue.

*Meaningful Mitigation Measures within the Olympic Coast National Marine Sanctuary*

▮ Plaintiffs contend that in issuing the Final MMPA Rule regarding the NWTRC, the NMFS did not comply with the statutory requirement under the MMPA that it "set forth permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa). In establishing the "least practicable adverse impact" standard, Congress has required that "[i]n particular, efforts should be made to pro-

tect essential habitats, including the rookeries, mating grounds, and areas of similar significance for each species of marine mammal from the adverse effect of man's actions." *Id.* at § 1361. Plaintiffs claim that the Defendants' standard mitigation measures are ineffective at preventing marine mammal take, yet the Final MMPA Rule does not identify any areas within the Navy's 122,000 square nautical mile range where sonar training could be excluded or subject to additional mitigation · or procedural checks that would reduce harm to marine mammals. Plaintiffs contend that the NMFS's failure to identify and prescribe such measures was arbitrary and capricious.

They argue that this is particularly true in regard to the Olympic Coast National Marine Sanctuary. Plaintiffs allege that the record shows that the NMFS failed to adequately consider mitigation that could reduce impacts to the whales and dolphins in the Sanctuary, which they allege provides important foraging habitat for endangered marine mammal species including the Southern Resident killer whales in the spring and humpback whales in the summer. Plaintiffs claim that the Final MMPA Rule and LOA allow the Navy to conduct training in and around the Sanctuary regardless of the season, and thus nothing bars the Navy from concentrating training there during times of seasonal importance to marine mammals. Plaintiffs claim that the NMFS failed to analyze the benefit of precluding the use of sonobuoys in the Sanctuary, and of precluding the use of hull-mounted sonar in portions of the Sanctuary where the Navy conducts the majority of its in-transit activities. They also dispute Defendants' characterization of the size of the impacted portion of the Sanctuary as "small."

Congress has decreed that, "[f]or a military readiness activity . . . a determination

of 'least practicable adverse impact on such species or stock' ... shall include consideration of personnel safety, practicality of implementation, and impact on the effectiveness of the military readiness activity." 16 U.S.C. § 1371(a)(5)(A)(ii). Defendants claim that the "NMFS must perform 'a careful balancing of the likely benefit of any particular measure to the marine mammals with the likely effect of that measure on personnel safety, practicality of implementation, and impact on the effectiveness of the military-readiness activity.' AR Doc. B.6 at 37, 40." Defendants further claim that "Congress required this balancing when military readiness activities are involved to ensure that "the use of mitigation and monitoring measures would be focused on the biologically significant impacts on marine mammals.' H.R. Conf.Rep. 108-354, 108th Cong. 1st Sess., *reprinted in* 2004 U.S.C.C.A.N. 1407, 1447 (Nov. 7, 2003)." Finally, they claim that after performing the requisite balancing, the NMFS prescribed the mitigation program in the Final MMPA Rule, which is incorporated into the 2012 LOA and ITS.

Defendants contend specifically that because the Navy conducts most of its in-transit ASW training more than 50 nautical miles from shore, there is only a relatively small area within the Sanctuary in which limited ASW training might occur. *See* AR Doc. B.6 at 41–42, AR Doc. B.25 at 1556. Further, they argue, the total number of authorized ASW training hours (108 per year) is "relatively minor," and the exercises consist of a single vessel using sonar for approximately 1.5 hours. *See* AR Doc. B.6 at 42–43. In response to Plaintiffs' concerns about Southern Resident Killer Whales, humpback whales and gray whales, Defendants argue that only a "small number" of total takes have been authorized, all in the form of Level B harassment, *id.*, and all three species

would likely be detected by Navy lookouts before entering the 1,000 yard power-down zone, further reducing the already low potential for adverse effects. *See* AR Doc. B.25 at 1821–25; AR Doc. B at 4681–83; AR Doc. F2 at 255; AR Doc. B.2d at 1868. Defendants state that, considering all of these factors, the NMFS determined that prohibiting sonar use in the sanctuary "was not likely to yield a significant biological benefit for the affected marine mammal species or stock." Defendants' Motion and Opposition, 44:4–5 (citing AR Doc. B.6 at 42–43, 45).

Defendants assert that the NMFS further determined that the Navy needs flexibility to train adequately in a variety of conditions, which may require some ASW training in the outer reaches of the Sanctuary. AR Doc. B.6 at 41–42. Defendants also assert that the Navy requires "a considerable amount of planning, education, and subsequent attention to establish and implement protective areas." Defendants' Motion and Opposition, 44:9–10 (citing AR Doc. B.6 at 42; AR Doc. B.25 at 2173–75). Defendants state that the NMFS therefore "determined that the limited potential biological benefits of establishing a permanent or seasonal closure in the sanctuary were outweighed by practicability considerations and the impact on training effectiveness." *Id.* at 44:11–13 (citing AR Doc. B.25 at 2173–75, 2179–80). In response to Plaintiffs' concerns that nothing prohibits the Navy from concentrating all of its ASW training in the Sanctuary during the time of alleged importance for marine mammals, Defendants repeat their contention that the NMFS determined that the permanent or seasonal closures proposed by Plaintiffs would not avoid any biologically significant impacts on marine mammals.

The citations Defendants provide for their claim that the NMFS must perform a

careful "balancing," AR Doc. B.6 at 37 and 40, are to the Final MMPA Rule for the Navy training activities within the NWTRC. AR Doc. B.6. That document does contain the language quoted by Defendants.[9] The statute itself, Section 1371(a)(5)(A)(ii), however, makes no reference to "balancing" benefits and effects. The basis for the NMFS's assertion that "NMFS must perform a careful balancing" and Defendants' assertion that "Congress required this balancing" is therefore unclear. The House Conference Report cited by Defendants ("the Report") does not "require" any balancing to be done by the NMFS. Rather, the balancing is described in the Report as built into the proposed changes in the statute. The Report states in part:

> the conferees agreed to eliminate the requirements for "specific geographic region," and "specific geographical region," and "small numbers," terms that have proven more valuable as a basis for litigation than affording legitimate or demonstrable protection to marine mammals. Such changes would ensure a credible and flexible regulatory process that properly balances the equities associated with military readiness and maritime species protection.

*See* 2004 U.S.C.C.A.N. 1407, 1447 (Nov. 7, 2003). This language refers to the 2003 amendment to the MMPA to exempt military readiness activities from the "small numbers" and "specified geographical region" requirements of the MMPA. *Id.* at § 1371(a)(5)(F)(i).

The Report further provides: "[t]he conferees intend that the changes in the definition of 'harassment,' as well as changes in the incidental take permit process, would not eliminate the existing requirements for mitigation and monitoring. (16 U.S.C. § 1371(a)(5)). Instead, the use of mitigation and monitoring would be focused on the biologically significant impacts on marine mammals." *Id.* Thus, in referencing the definitions of harassment set forth in 16 U.S.C. § 1362(18)(B), the Report does not set forth a new standard. Rather, it explains on the intended *effects* of those Congressionally-mandated definitions.

Here, Defendants argue that the NMFS properly rejected the closures suggested by Plaintiffs in part based on the conclusion that doing so "was not likely to yield a significant biological benefit for the affected marine mammal species or stock." For the NMFS to make its decision on that basis would be for it to give double weight to that consideration, because it is already built into the statutory framework.

To the extent that Plaintiffs base their contention on the claim that the mitigation measures as a whole prescribed by the NMFS are ineffective, the court has addressed and rejected that claim above.[10] The more specific contention now raised by Plaintiffs is that the NMFS acted arbitrarily and capriciously in failing to identify specific areas or prescribe additional mitigation measures in connection with the requirement that "efforts should be made to protect essential habitats, including the rookeries, mating grounds, and areas of

**9.** "NMFS reviewed the proposed NWTRC activities and the proposed NWTRC mitigation measures as described in the Navy's LOA application to determine if they would result in the least practicable adverse effect on marine mammals, which includes a careful balancing of the likely benefit of any particular measure to the marine mammals with the likely effect of that measure on personnel safety, practicality of implementation, and the impact on the effectiveness of the 'military readiness activity.' " AR B.6 at 37.

**10.** *See supra,* 23–28.

similar significance for each species of marine mammal from the adverse effect of man's actions." 16 U.S.C. § 1361.

The issue of sonar use in the Sanctuary is discussed as follows in the Final MMPA Rule:

*Comment 3:* NRDC and several other commentors recommended that NMFS provide additional protection for marine mammals from the use of sonar within the OCNMS [Olympic Coast National Marine Sanctuary], by specifically prohibiting sonar usage in the OCNMS, or at a minimum, limiting the exercises taking place with [sic] the OCNMS by requiring final approval from the Pacific Fleet command, or using other means to minimize sonar use. In support of this recommendation, NRDC notes the seasonal use of the area by migrating gray whales, summer resident gray whales that use the area for feeding, and Southern Resident killer whales (SRKW) that use the area for part of the year.

*Response:* The OCNMS is contained within the NWTRC and the delineation of the edge of the OCNMS essentially follows the edge of the 100–m isobath. The Navy will not deploy the PUTR within the OCNMS.[11] Otherwise, please see NMFS' response to comment 2, above. Of additional note, because of the seasonal nature of the use of the area by some of the species that the cementers mention, those species potential exposure to MFAS is likely an even smaller portion of the total hours, as some of the hours of operation will occur in months that they are not present.

AR Doc. B.6 at 6.

Comment 2 is described as a recommendation that the NMFS establish a protection area for northwest harbor porpoise landward of the 100–m isobath, along with a adjacent buffer zone. AR B.6 at 41. The NMFS' response to comment 2 provides in part as follows:

The Navy conducts about 99 percent of their MFAS activities in the W–237 area, which extends out approximately 200 nm from the coast of the northern half of Washington.... Within the W–237, the 100–m isobath extends out from the coast approximately 40 nm at some points, and up to 80 nm in the northern portion near the Strait of Juan De Fuca. As noted above in the introduction to this section, the Navy has conducted, and plans to conduct, the majority of their in-transit MFAS activities beyond 50 nm from shore, and has operated MFAS between 12 and 50 nm from shore infrequently in the past. As mentioned above, the PUTR ... is designed to be used in depths of 300–1200 ft., so it is unlikely that it will be used within the 100–m isobath. Based on this operational plan, there is only a relatively small area within the 100–m isobath in which the Navy would potentially operate MFAS; and this is only a very small percentage of the entire W–237 area that is available and in which the Navy typically operates MFAS. In order to adequately train, however, the Navy needs to train within a wide range of bathymetric conditions (*i.e.*, proximity to certain resources such as airfields), so it is unlikely that they would completely avoid the 100–m isobath.

In short, based on the their general operating plans, the overall size of the area available for training and the fact that they only plan to operate 108 hours of surface hull-mounted sonar total annually (but need to operate in a variety of conditions, including depths other

---

11. The PUTR is the portable undersea training range. AR B.6 at 40. Approximately ten percent of the surface hull-mounted MFAS is conducted in conjunction with its use. *Id.*

than within the 100–m isobath), it is likely that only a relatively small subset of the 108 hours of MFAS will be operated within the 100–m isobath, but these hours are needed for operational flexibility.

. . .

Lastly, NRDC notes that the vast majority of the total takes in the NWTRC are of harbor porpoises. This is correct; of the approximately 130,000 total annual authorized takes in the NWTRC, 119,-000 are of harbor porpoises. This is because harbor porpoises are considered more sensitive to sound than many other marine mammals and any exposure about a received level of 120 dB is considered a take. However, of the total number of harbor porpoise takes, approximately 85 percent are anticipated to occur at a received level between 120 and 140 dB, from which we would expect a comparatively less response. Additionally, only approximately 0.5 percent of these takes would result from exposure above a received level of 160 db, which is still far below received levels associated with injurious takes. In short, there are more takes of harbor porpoises because they are more sensitive to sound. However, because we use a step function to define their predicted response, instead of a dose curve as we do for other marine mammal species, a large portion of the takes will likely consist of the minimum response that we would still consider a take.

AR Doc. B.6 at 41–42.

Finally, Comment 5 is described as a recommendation that the NMFS establish a seasonal protection area in certain canyons and banks on the NWTRC that represent important foraging habitat; particularly for humpback whales during their feeding season from June to October. AR

B.6 at 42. In response, the NMFS states in part as follows:

The Navy plans to conduct approximately 108 hours of surface hull-mounted MFAS use in the NWTRC annually. Allowing for the fact that it is not all planned in the months of June–October, and not all planned in any one of the specific areas noted in the comment, only a small number of hours of sonar are likely to occur in any of the specific areas recommended for protection by the commentors.

Generally speaking, because of the small numbers of hours that the Navy may be conducting MFAS sonar training, the short duration of the exercises, the use of only one single hull-mounted sonar vessel, and the huge area over which training is conducted, the impracticability of designating additional protective areas identified by the commentors outweighs the likely benefit. It requires a considerable amount of planning, education, and subsequent attention by the Navy to establish and implement protective areas. Furthermore, the Navy only anticipates taking a small number of the species for which the protected areas would be established, by Level B Harassment (15 humpback whales, 14 killer whales, and 4 gray whales), with the exception of harbor porpoises (discussed in comment response 2). Considering the density of marine mammals and the likelihood of encountering them in any location during the course of a 1.5. hour period we cannot predict with sufficient certainty that avoiding these areas would necessarily result in a decrease of takes.

AR Doc. B.6 42–43.

After reviewing these excerpts from the Final MMPA Rule, the court finds that Plaintiffs have not carried their burden of demonstrating that the NMFS abused its

discretion or acted arbitrarily, capriciously or otherwise not in accordance with law in regard to the requirement under 16 U.S.C. § 1361 that efforts should be made to protect essential habitats. The NMFS's responses to the above comments demonstrates a rational basis for the agency's decision on this issue. The court takes judicial notice of the physical location of the Sanctuary, based on the information provided by Defendants. *See* http://sanctuaries.noaa.gov/science/condition/ocmns/history.html (the Sanctuary extends seaward "40 to 72 kilometers (25 to 45 miles)" off the coast). The court therefore is unpersuaded that Defendants have mischaracterized the size of the impacted portion of the Sanctuary. Accordingly, the court will deny Plaintiffs' motion for summary judgment as to this issue, and grant Defendants' motion for summary judgment as to this issue.

## CONCLUSION

In light of the foregoing, IT IS HEREBY ORDERED as follows:

1) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED as to the NMFS's compliance with the requirement under the ESA that agencies base their decisions on the best scientific data available in the issuance of the 2012 Letter of Authorization Biological Opinion as to the 2010 and 2011 dolphin studies.

2) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED as to the NMFS's compliance with the requirement under the ESA that agencies base their decisions on the best scientific data available in the issuance of the 2012 Letter of Authorization Biological Opinion as to the beaked whale study.

3) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED as to the issue of compliance with the best available scientific data standard in issuance of the Incidental Take Statement.

4) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED as to the issue of compliance with the requirement under the ESA that the NMFS analyze the effect of the entire agency action.

5) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED as to the issue of the NMFS improperly relying on mitigation measures required under the Final MMPA Rule in reaching its no jeopardy conclusion under the ESA or otherwise acting in a manner not in accordance with law in regard to the mitigation measures required under the Final MMPA Rule.

6) Plaintiff's motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED as to the issue of compliance with the requirement under the ESA that an agency's jeopardy analysis include evaluation of both direct and indirect effects of the action.

7) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED as to the issue of a violation of the MMPA based on the issuance of the 2012 Letter of Authorization.

8) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED as to the issue of compli-

ance with requirement under the MMPA that the agency set forth means of effecting the least practicable adverse impact on marine mammal species or stock and its habitat.

## REMEDY

Plaintiffs state expressly that in recognition of the importance of military readiness, they do not ask for injunctive relief. Instead, they ask the court to remand the NMFS's Five–Year Regulations, its 2012 Letter of Authorization, and biological opinions to the NMFS to require the agency to comply with the requirements of the ESA and the MMPA within eight months of the order of the court.

In response, Defendants have requested an opportunity to submit a supplemental brief addressing the appropriate scope and duration of any remand.

Accordingly, Defendants are HEREBY GRANTED twenty (20) days to file a supplemental brief regarding the appropriate scope and duration of the remand to be ordered in this case. Plaintiffs are GRANTED ten (10) days after the filing of Defendants' brief to file a response.

**IT IS SO ORDERED.**